In the Matter of the Estate of WILLIAM HENRY WILLIAMS, Deceased.

Surrogate's Court, Clinton County, June 8, 1933.

*Pierce & Greer*, for the executors, Belle Graham Williams and Chemical Bank and Trust Company.

*Miller & Hubbell*, for Irma Williams Stevenson.

*Robert C. Booth*, special guardian of John H. Stevenson and Merwin Jeanette Stevenson, infants.

HARRINGTON, S.   William Henry Williams died, a resident of Lyon Mountain, Clinton county, N. Y., on October 14, 1931. His last will and testament, dated April 9, 1926, was duly admitted to probate by this court on October 21, 1931.   His widow, Belle Graham Williams, and the United States Mortgage and Trust Company of New York, were designated in the will as executors and trustees.   The Chemical Bank and Trust Company is the successor by merger to the United States Mortgage and Trust Company of New York, and with Belle Graham Williams duly qualified as one of the executors herein.   The account of the executors as filed shows gross assets of $310,991.01.   After deducting the necessary expenses of administration, claims of creditors, etc., the account shows that the trust fund established pursuant to paragraph sixth of decedent's will amounts to $124,105.70.

The executors in this proceeding have requested this court to determine whether the expenses of maintenance of certain real property devised to the said Belle Graham Williams for life shall be paid by the executors out of the income of the trust fund established pursuant to paragraph sixth of decedent's will or out of the principal of said trust fund.

The fourth paragraph of decedent's will reads as follows: " To my wife, Belle Graham Williams, I give and devise my real estate located at Lyon Mountain, Clinton County, New York, known as Camp Aiyukpa, with all lands, premises, residences, barns, stables and other buildings of any sort or description thereon located, to have and to hold during her life and upon the decease of said Belle Graham Williams the whole of said real estate shall be and become a part of my residuary estate and shall be disposed of as hereinafter provided."

Under paragraph sixth of decedent's will, the residuary estate is given to his executors and trustees above named, with instructions to collect and pay over the income thereon to Belle Graham Williams during her life, and then to his niece, Irma Williams Stevenson, during her life, and upon the death of the survivor of these two beneficiaries, to deliver and transfer the whole of said trust fund to the next of kin of said Irma Williams Stevenson.   This para-

graph of the will further provides that in the event that the net income from said trust fund shall exceed $20,000 annually, then one-half of such excess shall be paid to the said Irma Williams Stevenson. Payments of income are directed to be made not less frequently than quarterly.

The seventh paragraph of decedent's will reads as follows: " I hereby give and grant to my executors and trustees hereinafter named, in whichever capacity acting, or such of them as shall qualify and undertake the execution of this my will and to the survivors or survivor of them and their successors, subject to the provisions of the fourth paragraph hereof, full right and power to sell any and all real estate of which I may die seized, at public or private sale and on such terms and conditions as they, she or it, in her or its absolute discretion, shall deem to the best interests of my estate."

It appears that the real estate known as " Camp Aiyukpa," as mentioned in paragraph fourth of decedent's will, consists of approximately 2,588 acres, of which 1,878 acres are above water and 710 acres are under water. There is no incumbrance on this property. This property was used by decedent as a summer camp. In the New York State transfer tax proceedings this property was appraised at $22,873. The property has yielded no revenue since decedent's death and whether or not it can be made to yield any revenue in the immediate future is not known. The annual expense of maintaining the property is approximately $2,650, of which $1,200 is for taxes, $1,200 is for the services of a caretaker and $250 is for fire insurance premiums. There will also be the additional expense, if any, of necessary repairs. The trustees herein estimate that the net income of the trust fund established pursuant to paragraph sixth of decedent's will, will not exceed $3,210 for the year 1933. Due to the fact that up to this date the camp property devised to decedent's widow for life has been unproductive and the annual expense of maintaining the same amounts to approximately the net income received on the trust fund established for her benefit, Mrs. Williams, as life tenant under paragraph fourth of the will, asserts that the cost of maintenance of these camp premises should be a proper charge against the principal of the trust fund established pursuant to paragraph sixth of decedent's will. Accordingly, the petitioners herein request that this court decide whether such expenses are a proper charge to be made by them against the principal or the income from said trust fund.

The provisions of the will would seem sufficient to indicate that the expenses to be incurred as maintenance charges for Camp Aiyukpa are not a proper charge against either the principal or the income of the trust fund created under paragraph sixth. It is to

be noted that under paragraph fourth, decedent's widow was devised a legal life estate in the premises therein mentioned. She alone has the right to all benefits therefrom during her lifetime and likewise is responsible for the usual maintenance charges of said property which the law places upon a life tenant. We cannot speculate upon the reasons which prompted the decedent to create a separate life estate of this property for the benefit of his widow by a separate paragraph of his will, rather than to include it as part of the trust fund to be created under paragraph sixth of his will and in which his widow is a *cestui que trust*. It should be noted, under paragraph fourth of the will, that this camp property does not become a part of the residuary estate or the general trust fund as created by paragraph sixth of the will, until upon the decease of Mrs. Williams. It is also to be noted that under paragraph seventh of the will, the rights of the executors and trustees to sell any real estate of the decedent is limited by the provisions of paragraph fourth with the result that the executors and trustees cannot sell this camp property during the lifetime of Mrs. Williams without her consent. Thus, the plain reading of the will negatives any intent on the part of the decedent to impose the maintenance charges of this camp property either upon the principal or the income of the trust fund created under paragraph sixth of the will.

Accordingly, the general rule that as between the life tenant and the remaindermen, the former is bound to pay the general maintenance charges upon the premises devised for life, must prevail in this case. The exception to that rule is clearly stated in *Matter of Albertson* (113 N. Y. 434, 439): " To change the general rule that, as between the life tenant and the remainderman, the former is bound to pay the taxes imposed, and the interest accruing upon a mortgage, a very clear expression of such an intention on the part of the testator must be found in his will. The usual purpose of the testator in providing for a beneficial interest in a trust estate is, that the net income shall be applicable only, and that the corpus, or capital, of the trust estate shall remain intact until the trust shall have determined. The principle has been so long and firmly established that interest on mortgages, taxes, repairs and all those current expenses which are fairly incidental to the maintenance of the realty used by a life tenant, are payable by him, that it should be adhered to upon all occasions, unless, in so doing, we violate a plain direction to the contrary; which, if not found in the will in so many words, yet is the only one which a fair and reasonable construction permits of our finding."

In the above case a trust fund was created for decedent's widow during her life. Upon her decease certain legacies were directed to be paid out of the capital of the trust fund and the remainder of the capital of the trust fund to be distributed as therein mentioned. Under paragraph sixth of decedent's will, the widow was given the right to occupy a farm free from rent during her lifetime and the trustees were directed during such occupancy to pay out of decedent's estate all taxes and repairs for the proper maintenance of said premises, together with all interest upon any mortgages on said farm premises. Despite the fact that in this case the farm was included as part of the trust fund, and not as a separate life estate, as in the instant case, and despite the further fact that the trustees were directed during the occupancy of said farm by the widow to pay out of decedent's estate the maintenance charges thereon, as above mentioned, the court held that the language of the will was not sufficiently clear to indicate an intent on the part of the testator to pay such maintenance charges out of the principal of the trust fund, stating at page 440 of the opinion as follows: " To sustain a construction, whereby the capital might be more or less seriously impaired, by using it in the payment of taxes and of interest on the mortgage, and in maintaining the realty used by the beneficiary, we ought to find words of the most unmistakable import and pointing unequivocally in that direction."

The case of *Matter of Albertson (supra)* seems to be the leading authority on this subject and the rule therein stated on the matter in question has been cited with approval many times. (See *Stevens* v. *Melcher*, 152 N. Y. 551, 565; *Chamberlin* v. *Gleason*, 163 id. 214, 219; *Spencer* v. *Spencer*, 219 id. 459, 465; *Matter of Ardrey*, 232 id. 109, 111; *Matter of Jackson*, 258 id. 281, 289.) However, while recognizing the general rule that a life tenant of real estate must assume the ordinary maintenance charges thereon, in some of the above-mentioned cases where unproductive real estate formed a part of a trust fund, the court authorized such maintenance charges to be paid out of the principal of the trust fund, due to the fact that the court construed the intent of the testator to this effect from the language of the will and the general surrounding circumstances. In all of these cases, however, the unproductive real estate formed a part of a trust estate and was not, as in the instant case, the subject of a specific devise to a life tenant. They are not, therefore, in point with the instant case and do not vary, but on the contrary cite with approval, the general rule applicable to the responsibility for such maintenance charges upon a life tenant, as mentioned in *Matter of Albertson (supra)*. Counsel for executors cite *Matter of Pitney* (113 App. Div. 845) and *Matter of Menzie*

(54 Misc. 188) as authority for the propriety of making the maintenance charges on this camp property a charge against the principal of the trust fund above mentioned. It is sufficient to say that in both of these cases the real estate in question was part of the trust fund and in fact had been acquired by the trustees in connection with their duties of preserving the trust fund property. No such situation obtains in the instant case. I am, therefore, of the opinion that the executors and trustees herein are not authorized to pay any of the maintenance charges on the premises mentioned in paragraph fourth of decedent's will, either from the principal or the income from the trust fund established under paragraph sixth of decedent's will, at least during such time as the life tenant, Belle Graham Williams, continues to hold her life estate therein; that such charges should be borne by the life tenant. There is one exception, however, to this rule and that is with reference to the premiums due and payable upon fire insurance policies covering these premises. As to these charges, I do not believe that the life tenant is obligated to pay any greater sum than that which she deems is necessary for the protection of her life interest in these premises; that the interest of the remaindermen in said premises should be paid by them individually unless, with the consent of the life tenant, the same are to be paid from the principal of the trust fund herein mentioned. (See *Peck* v. *Sherwood*, 56 N. Y. 615, 618; *Sawyer* v. *Adams*, 140 App. Div. 756; *Beekman* v. *Fulton County Farmers' Ins. Assn.*, 66 id. 72; *Kirchner* v. *Kirchner*, 71 Misc. 57, 63.)

Counsel for executors in their memorandum present the possibility of future problems affecting this matter, as follows: " It is possible that the life tenant may formally surrender her life estate in the camp property, in which event it would become a part of the residuary estate. If such a situation should develop, · your petitioners, as executors and trustees, would be materially aided in the proper administration of the estate by having the instructions of this Court with respect to their obligations as to these maintenance charges. Would it be their duty to apply whatever income is available from the residuary estate to the payment of such charges, or would they be entitled to charge such expenses against the principal of the residuary estate? On the other hand, if without surrendering her life estate in the camp property the life tenant should refrain from paying these maintenance charges, would the petitioners be justified in paying the net income from the residuary estate to the life beneficiary without deduction for maintenance charges, on the ground that they had no jurisdiction of the camp

property, which was not a part of the residuary estate, and that the proper remedy of the remaindermen would be to bring an action against the life tenant for such damages, if any, as had resulted to the reversionary estate from the failure of the life tenant properly to maintain the same?"

It would not seem proper at this time for this court to speculate upon the legal effect arising from the occurrence of any of the above matters which, in the opinion of counsel for the executors, may occur. If this property, in the opinion of the executors and the life tenant, is likely to continue for some indefinite time to be unproductive and the annual maintenance charges thereon nearly equal to the annual net income on the trust fund herein mentioned, it would seem the prudent thing to do to sell the premises, even at a sacrifice price and invest the proceeds thereof for the benefit of the life tenant with the remainder upon the death of the life tenant to form a part of the trust fund. I know of no rule of law to prevent the life tenant by a proper instrument from formally surrendering her life estate in this camp property. In the instant case, if she does so and the property becomes a part of the trust fund, with the maintenance charges thereon payable either from the principal or the income of the trust fund, then it would appear that we had permitted the life tenant to do indirectly that which she had been forbidden to do directly. In other words, we would, in legal effect, have redrafted the decedent's will by placing this unproductive camp property in the trust fund. It could then be argued that as part of the trust fund, the same rule of law should apply as to the method of charging the necessary maintenance expenses thereon as was applied in some of the above-mentioned cases in which such charges were held to be proper against the principal of the trust fund. I cannot believe that any court would be justified in upholding the validity of such a situation, for certain it is that we ought not to construe the intent of a testator by the acts of a devisee under the will rather than by the clearly expressed language in the will. Furthermore, there would seem to be no motive for the present life tenant of these premises to formally surrender the same if the maintenance charges thereon were then to be charged against the income of the trust fund. This would not in any wise better her present situation as she is at present receiving all of such income. The only equitable alternative in the event the life tenant surrenders her interest in these premises would seem to be to have the premises held in a separate trust fund for the benefit of Irma Williams Stevenson during her life, with the remainder at her death to go to her next of kin. This would at least remove the benefits, as well as the charges, from

the present life tenant. In the event that the premises remain unproductive, it might well be possible to secure a mortgage upon the same to temporarily pay such maintenance charges until such time as the same could be sold and the proceeds therefrom set up for Irma Williams Stevenson during her lifetime with the remainder to her next of kin. In the event that the present life tenant does not surrender her life estate, but refrains from paying the maintenance charges thereon, then it would seem that the proper remedy is for the trustees and/or remaindermen to attempt to compel her to do so by securing a mandatory injunction, which would appear to be the ordinary remedy to compel a life tenant to perform a contract which the law imposes upon him. (See *Sawyer* v. *Adams, supra,* 758, 759.)

I have discussed these matters without attempting to decide the same primarily for the purpose of indicating that the situation would seem to be one that should be determined by an amicable agreement between the interested parties. If this cannot be done, or is not done, then it would seem that the legal effect of any such course of action as contemplated by counsel for the executors can be decided when, as and if the same happens.

Costs and additional allowances, pursuant to sections 278 and 279 of the Surrogate's Court Act, are hereby allowed the petitioner, counsel for Irma Williams Stevenson, and the special guardian for the infants herein named, to be paid from the principal of the trust fund. (*Matter of Petremont,* 213 App. Div. 318; *Chisholm* v. *Hamersley,* 114 id. 565; *Robertson* v. *DeBrulatour,* 188 N. Y. 301, 318; *Spencer* v. *Spencer,* 219 id. 459, at pp. 468, 469.) Such costs and allowances are to be based upon the affidavits of the respective counsel and special guardian for the infants herein, showing the legal services performed by them and their necessary disbursements incurred. Proposed decree to be settled upon five days' notice to all the interested parties.

Prepare decree accordingly.